# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ROBERT BREAULT, D.M.D,

Plaintiff,

v.

STRAINE DENTAL MANAGEMENT, LLC,
STRAINE DM HOLDINGS, LLC, and
STRAINE DM INTER HOLDINGS, LLC

Defendants.

C.A. No. 2022-0410-JTL

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action in which plaintiff Robert Breault seeks to obtain books and records from defendants Straine Dental Management, LLC (the "Company").

## I.     FACTUAL FINDINGS

1.     The Company is a manager-managed Delaware limited liability company. At all relevant times, its internal affairs were governed by a Limited Liability Company Agreement dated June 20, 2017. JX 1 (the "LLC Agreement" or "LLCA").

2.     Kerry Straine is the CEO and President of the Company.

3.     The Company provides dental practices with administrative services such as payroll management, employee benefits management, accounting for vacation and time off, and bookkeeping.

4.     Breault is a practicing dentist and the President of Cromwell Family Dental, P.C. (the "Practice").

5.     The Company and the Practice entered into a Services Agreement dated January 1, 2018. JX 2 ("Services Agreement").

6. Breault acquired a member interest in the Company. In return for a capital contribution of $20,000, Breault received two Class B Membership Units in the Company, reflecting a 2.139% member interest. In return for a capital contribution of $2,500, Breault received 25 Class D Membership Units in the Company, reflecting a 0.267% member interest. This order refers to those units as the "Disputed Units."

7. Breault entered into a letter of intent with the Company regarding a potential transaction under which the Company would acquire the non-clinical assets of certain dental practices that Breault owned, including the Practice (the "Potential Transaction").

8. Between 2019 and 2021, the Company engaged in discussions with financing sources to fund the Potential Transaction.

9. By email dated February 14, 2022, Breault informed Straine that he would not be participating in the Potential Transaction and that the Services Agreement was terminated. He wrote: "I will not be able to execute on my APCA . . . I understand that things will need to get unwound and I will cooperate fully." JX 3 at 2–3. The reference to a need for "things . . . to get unwound" acknowledged the fact that the Company provided many management services to the Practice, such as payroll, and that there would need to be a transition. Breault Tr. 32–33.

10. By email dated February 15, 2022, Straine responded on behalf of the Company, stating: "I'm sorry to learn that you do not want to move forward with Straine Dental Management and want to unwind the relationship. I accept your decision. Vera will email you the mutual release agreement." JX 3 at 2.

11. In his email, Straine stated that Breault would receive a refund of $4,950 for services that he had prepaid through the end of the month. *Id.* Under the Services Agreement, Practice paid in advance for monthly services. At the time of termination, the Practice had paid in advance for services through the end of February. Straine's identification of the refund amount only makes sense if Straine understood that the Services Agreement was terminated by mutual agreement as of February 15, 2022.

12. In his email, Straine also said that "[u]pon execution of the mutual release agreement, [the Company] will pay you the total redemption price of $22,500." *Id.* Straine thus contemplated that the draft Membership Unit Redemption and Mutual Release Agreement would cover additional issues beyond documenting the agreed-upon termination of the Services Agreement, including the redemption of the Disputed Units.

13. Also on February 15, 2022, Vera Powell, the Company's Director of Operations, sent Breault a draft Membership Unit Redemption and Mutual Release Agreement. *Id.*

   a. The draft Membership Unit Redemption and Mutual Release Agreement contained a recital stating that "the Company and the Corporation have mutually agreed to terminate the Services Agreement, thereby causing the Company no longer to be a Client of the Company." JX 4 at 1. That recital was framed in the past tense, reflecting that the Services Agreement already had been terminated. Although the draft agreement was never signed, the recital provides additional evidence that the Services Agreement had terminated by mutual agreement on February 15, 2022.

b. The draft Membership Unit Redemption and Mutual Release Agreement that Powell emailed to Breault included an "Effective Date" of February 28, 2022. But it also provided for a refund of prepaid services, consistent with the termination of the Services Agreement by mutual agreement on February 15. The draft included an erroneous amount for the refund, but that error does not change the fact that the Company believed the Practice was entitled to a refund in light of the termination of the Services Agreement before the end of the monthly period. The draft agreement provides additional evidence that the Services Agreement had terminated by mutual agreement on February 15.

14. One of the services that the Company provided to the Practice was an analytics dashboard offered under a white-label agreement with Dental Analytics. Breault lost access to the analytics dashboard within a week after Straine's email on February 15, 2022. The Company's decision to cut off Breault's access to the dashboard provides additional evidence that the Services Agreement had terminated by mutual agreement on February 15.

15. During the second half of February 2022, Breault reached out to vendors to replace the services that the Company had been providing. His efforts provide additional evidence that the Services Agreement had terminated by mutual agreement on February 15.

16. On March 16, 2022, Breault asked for financial information for the Practice. He explained that he needed the Company to provide information because the "services

agreement [was] terminated" and he no longer had the ability to access the information. JX 5 at 1.

17. The parties discussed potential ways to unwind their affairs but could not reach agreement.

18. By letter dated April 1, 2022, Breault sent the Company a demand for books and records under 6 *Del. C.* § 18-305. JX 7. (the "Demand").

19. The Demand sought the following:

a. Information regarding the status of the Company's business and financial condition, including without limitation a copy of internally prepared financial statements for the three months ended 3/31/22, and for the FYE 12/31/2021, as well as audited, reviewed or compiled financial statements of the Company for the FYE 12/31/2021 prepared by the Company's independent certified public accounting firm;

b. Any appraisal or valuation of the Company performed in connection with the anticipated financing transaction between the Company and Morgan Stanley, including its affiliates, and any other potential financing source, and a copy of any and all financing commitments between the Company and Morgan Stanley, including its affiliates, and any other potential financing source;

c. A copy of the Company's 2021 income tax return;

d. A current list of the name and last known business, residence or mail address of each member and manager;

e. A copy of any amendments to the LLC Agreement, and copies of any written powers of attorney associated with the LLC Agreement;

f. True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member or which each member has agreed to contribute in the future;

g. The date on which each member became a member;

h. A description of the current status of discussions with Morgan Stanley, its affiliates, and any other potential financing source regarding a financing of the Company;

i. The number of dental practices who have entered into an Asset Purchase and Contribution Agreement with the Company.

20. The Demand recited that Breault's purposes in seeking these books and records were (i) "to evaluate Dr. Breault's investment in [the Company] based upon representations of [the Company] during the period from approximately November 1, 2021 through February 15, 2022"; (ii) "to be made aware of the status of the financing transaction represented by management of [the Company] to be imminent during such periods"; and (iii) "to ascertain whether there have been any purported amendments to [the Company's] operating agreement, as anticipated in connection with such financing." JX 7 at 2.

21. The LLC Agreement contains a call right that enables the Company to acquire a member's units at a specified price (the "Call Right"). The specific language of the Call Right appears in the legal analysis below.

22. One week after receiving the Demand, by letter dated April 8, 2022, the Company sent Breault a notice stating that the Company was exercising the Call Right and purchasing the Disputed Units for total consideration of $9.00, which was the contractually specified price. JX 8 at 2.

23. By letter dated April 13, 2022, the Company took the position that the Demand was moot because Breault was no longer a member of the Company following the exercise of the Call Right. JX 9 at 1.

24.     By letter dated April 14, 2022, Breault disputed the exercise of the Call Right and asserted that Breault was still a member of the Company with a right to inspect books and records.

## II.     OPERATIVE LEGAL PRINCIPLES AND CONCLUSIONS OF LAW

25.     The Company opposes Breault's action for books and records exclusively on the basis that he was not a member at the time he filed this action. If Breault was not a member on that date, then he cannot obtain relief, and the Company prevails. If Breault remained a member, then there is no dispute that he is entitled to the books and records that he seeks.

26.     It is undisputed that Breault was a member of the Company until April 8, 2022, when the Company purported to exercise the Call Right. The operative question is whether the Company validly exercised the Call Right.

27.     "[W]hen analyzing an LLC agreement, a court applies the same principles that are used when construing and interpreting other contracts." *Godden v. Franco*, 2018 WL 3998431, at *8 (Del. Ch. Aug. 21, 2018). "'When interpreting a contract, the role of a court is to effectuate the parties' intent.' Absent ambiguity, the court 'will give priority to the parties' intentions as reflected in the four corners of the agreement construing the agreement as a whole and giving effect to all its provisions.'" *Id.*

28.     Section 7.3(a) of the LLC Agreement identifies a series of events as "Triggering Events." LLCA § 7.3(a)(iv). One is when "a Class B, Class C or Class D Member's Dental Practice ceases to be a Client of the Company." *Id.* When a Triggering

Event occurs, "the Company shall immediately have the right at its option to purchase all of such Member's Membership Units, except as set forth in § 7.3(b)." *Id.*

29. Section 7.3(c) of the LLC Agreement establishes a time period in which the Call Right must be executed. It states:

> The Company shall exercise its right to purchase such Member's Membership Units by providing written notice (the "Notice") to such member within fifteen (15) days of discovering the Triggering Event (the "Notice Date"). The Notice must specify a date for the closing of the purchase, not to be more than ninety (90) days after the Triggering Event (the "Closing").

LLCA § 7.3(c) (the "Fifteen-Day Provision").

30. Under the plain language of the Fifteen-Day Provision, the Call Right had to be exercised within fifteen days of the Company discovering the Triggering Event.

31. The Company discovered the Triggering Event on February 15, 2022, when Straine agreed to a termination of the Services Agreement.

32. Under the plain language of the Fifteen-Day Provision, the time to exercise the Call Right ran on March 2, 2022.

33. The Company did not purport to exercise the Call Right until April 8, 2022.

34. Because the Company exercised the Call Right after the exercise period expired, the attempted exercise of the Call Right was ineffective.

35. Because the attempted exercise of the Call Right was ineffective, Breault remains a member and is entitled to the books and records that he seeks.

36. To avoid this result, the Company offers a series of arguments.

a.	The Company contends that the Fifteen-Day Provision contemplates a period of fifteen business days rather than fifteen calendar days. There is no support for this assertion. The Fifteen-Day Provision does not include the word "business."

b.	The Company contends that the parties did not reach agreement on a termination of the Services Agreement in the exchange of emails on February 14 and 15, 2022. Breault proved by a preponderance of the evidence that he and Straine reached agreement. The email exchange is clear. After the email exchange, both sides acted as if the Services Agreement had terminated on February 15.

c.	The Company contends Breault did not believe that the Services Agreement had terminated on February 15, 2022, because he sent an email on March 16, which stated that the Services Agreement had been terminated. That email was confirmatory and described the state of affairs that had existed since February 15. It was not a new effort to terminate the Services Agreement. The parties had terminated the Services Agreement by mutual agreement on February 15.

d.	The Company argues that the parties did not reach agreement on a mutual termination of the Services Agreement because they never executed the draft Membership Unit Redemption and Mutual Release Agreement. Those are two different things. By terminating the Services Agreement, the parties terminated the Company's obligation to provide services to the Practice. The draft Membership Unit Redemption and Mutual Release Agreement covered a wider array of relationships between Breault and the Company. As the title indicates, it also covered the redemption of the Disputed Units and included a mutual release of claims. The failure to reach agreement on the terms of the

Membership Unit Redemption and Mutual Release Agreement does not mean that the parties had not agreed to terminate the Services Agreement. Neither side imposed any conditions on the termination of the Services Agreement. Instead, Breault and Straine reached agreement on terminating the Services Agreement.

e.     The Company argues that the LLC Agreement requires both a mutual written agreement to terminate the Services Agreement and at least ninety days written notice. That argument is unfounded. The Services Agreement says "or." The full language states: "This Agreement may be terminated at any time by the mutual written agreement of the Parties *or* upon at least 90 days written notice by either Party to the other." JX 2 § 7.2 (emphasis added).

f.     The Company argues that it amended and restated its LLC Agreement on April 13, 2022, and did not identify Breault as a member in that agreement. That was the Company's position at the time based on its contention that it had validly exercised the Call Right. That position is erroneous. Breault remains a member of the Company as the owner of the Disputed Units.

37.     To reiterate, the Company did not validly exercise the Call Right in a timely fashion. The Call Right lapsed and can no longer be exercised. Because the Call Right lapsed, Breault remained a member of the Company at the time he made the Demand and at the time the Complaint was filed. He continues to be a member of the Company to this day.

38.     The Company does not dispute that Breault has asserted proper purposes for inspection.

39.    The Company does not dispute the scope of the books and records that Breault has requested.

40.    Within five days, the Company will produce the documents sought in the Demand.

41.    Within ten days, the parties will submit a joint letter to the court identifying any issues that remain to be resolved at the trial level and proposing a schedule for addressing them. If there are none, then the parties will submit a stipulated form of order providing that all matters have been completed at the trial level and that the time for appeal shall begin to run.

Vice Chancellor J. Travis Laster
Dated: November 3, 2022